IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


DARYOUSH TAMIZKAR,

      Plaintiff,

v.                                  Case No. 09-2128-GLR

AMERICAN UNITED LIFE
INSURANCE COMPANY,

      Defendant.

## MEMORANDUM AND ORDER

Plaintiff brings this action pursuant to section 502(a)(1)(B)[1] of the Employment Retirement Income Security Act of 1974 ("ERISA") to recover unpaid benefits allegedly due him under the terms of a long-term disability plan issued by Defendant. This matter is before the Court on Defendant's Motion for Summary Judgment (doc. 17) and Plaintiff's Motion for Judgment on the Administrative Record (doc. 19). As set forth below, based upon a *de novo* review of the evidence in the administrative record, the Court finds that Plaintiff has not established that he cannot perform the material and substantial duties of his regular occupation as an engineering project manager. Accordingly, the Court rules that Plaintiff is not entitled to benefits under the plan. Accordingly, Defendant's Motion for Summary Judgment (doc. 17) is granted. Plaintiff's Motion for Judgment on the Administrative Record (doc. 19) is denied.

## I.    Nature of the Matter Before the Court and Background Information

Plaintiff Daryoush Tamizkar was employed by Selective Site Consultants, Inc. as an Engineering Project Manager. As an employee of Selective Site Consultants, he participated in the

---

[1]29 U.S.C. § 1132(a)(1)(B).

company's employee welfare benefit plan, which includes provisions for long-term disability benefits. The plan was insured and funded by Defendant American United Life Insurance Company under a group long-term disability insurance policy ("the Plan"). Although Defendant insured the policy, it delegated its claim administration duties to a third-party, Disability RMS, Inc. ("Disability RMS").

Plaintiff submitted a claim for long-term disability benefits under the Plan on June 18, 2007. He claimed disability as of May 11, 2007, alleging headache, back pain, post-concussion syndrome, and dizziness. At the time of his application he was 46 years of age. Disability RMS sent Plaintiff a letter denying his claim on August 21, 2007. The letter stated that, based upon its review, Disability RMS had determined that the information in the claim file supported neither the claimed impairment nor his alleged inability to perform his occupation as an engineering project manager. Disability RMS concluded that Plaintiff did not satisfy the Plan's definition of disability and, therefore, he did not qualify for long-term disability benefits. Plaintiff appealed the decision. He submitted additional medical records in support of his claim on December 14, 2007. Disability RMS denied the appeal on February 20, 2008, concluding that its original decision to deny benefits was appropriate. Plaintiff requested another appeal. He submitted additional medical documents for review on April 15, 2008. Disability RMS denied that appeal on June 24, 2008. Plaintiff then filed this action to recover benefits due him under the Plan.

## II.      Summary of the Parties' Arguments

Plaintiff contends that Defendant has denied him a full and fair review of his claim for long-term disability benefits, because it relied upon an unauthorized third-party claims administrator, Disability RMS, to deny his claim. He argues that the plan has no provision that expressly

authorizes designation of other persons to carry out the fiduciary duties of Defendant to administer claims for long-term disability benefits. Plaintiff concludes that any claim work performed by the disability administrator is void *ab initio*. He requests that judgment be granted in his favor and Defendant be ordered to calculate and pay all accrued benefits to date and future benefits. He also requests that the Court retain jurisdiction to entertain his motion for attorney fees, interests, and costs together with review of whether Defendant has paid and is paying the correct amounts.

Defendant concedes that the group policy does not contain any provisions allowing it to delegate its claims administration duties to Disability RMS. It argues that this procedural irregularity, nevertheless, does not entitle Plaintiff to judgment for an award of benefits. It asks the Court to reject the argument that the disability determination by an unauthorized claim administrator is void and subject to summary reversal. Defendant argues that the Court should instead review the disability determination under a *de novo* standard of review. Defendant contends that, even under a *de novo* standard of review, Plaintiff has failed to meet his burden to show that he is entitled to benefits under the Plan. It suggests that he has offered no argument or medical records to explain why the Court should find him disabled as defined by the policy. Defendant requests the Court to grant summary judgment in its favor and dismiss the complaint with prejudice at Plaintiff's cost.

## III.    Applicable Standard of Review

Where, as here, the parties in an ERISA case have moved for summary judgment and stipulated that no trial is necessary, "summary judgment is merely a vehicle for deciding the case;

the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor."[2]

ERISA provides a detailed and comprehensive set of federal regulations governing the provision of benefits to employees by employers, including disability benefits.[3] It gives a plan beneficiary the right to federal court review of benefit denials,[4] but does not establish the standard of review for such decisions.[5] In *Firestone Tire & Rubber Co. v. Bruch*,[6] the Supreme Court established the basic framework for determining the standard of review in ERISA cases that challenge the denial or termination of benefits: "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[7] If the plan grants discretionary authority to the administrator or fiduciary, then the proper standard of review is a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious.[8]

---

[2]*LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (quoting *Bard v. Boston Shipping Ass'n*, 471 F.3d 229, 235 (1st Cir. 2006)).

[3]*Hall v. Unum Life Ins. Co.*, 300 F.3d 1197, 1200 (10th Cir. 2000).

[4]29 U.S.C. § 1132(a).

[5]*Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 824-25 (10th Cir. 1996).

[6]489 U.S. 101, 115 (1989).

[7]*Id.* at 115.

[8]*Id.*; *Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006).

Defendant admits that Disability RMS made the decision to deny Plaintiff's claim for long-term disability. Defendant also concedes there are no provisions in the insuring agreement or plan that allow the plan administrator and fiduciary to designate other persons or entities to carry out fiduciary responsibilities, evaluate disability claims, or construe the terms of the plan. Under *Firestone*, therefore, the decision by Disability RMS to deny Plaintiff's claim for benefits is subject to a *de novo* standard of review. The Court rejects, however, the argument that the decision is void *ab initio* and therefore subject to summary reversal because of an unauthorized delegation of claims authority to Disability RMS. Although the Tenth Circuit has not directly addressed the issue, at least three other circuits have held that a denial of plan benefits by an unauthorized party is subject to review under the *de novo* standard.[9] Consequently, because Disability RMS does not have the discretionary authority to determine eligibility for benefits under the Plan, the proper standard of review is *de novo*. The Court adopts a *de novo* standard of review, therefore to review the claim.

## IV. Facts

### A. Relevant Provisions of the Plan

The Insuring Provisions of the Plan provide that "When [Defendant] AUL receives Proof that a Person is Disabled due to Sickness or Injury and requires the regular attendance of a legally qualified Physician, AUL will pay the Person a Monthly Benefit after satisfying the Elimination

---

[9]*Sharkey v. Ultramar Energy Ltd., Lasmo PLC, Lasmo (Aul Ltd.)*, 70 F.3d 226, 229 (2d Cir. 1995) ("Where an unauthorized party makes the determination, a denial of plan benefits is reviewed under the *de novo* standard."); *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 597 (6th Cir. 2001) ("When an unauthorized body that does not have fiduciary discretion to determine benefits eligibility renders such a decision, however, this deferential review is not warranted," and *de novo* review is applied); *Rodriguez-Abreu v. Chase Manhattan Bank*, 986 F.2d 580, 584 (1st Cir. 1993) (holding that because no plan document granted discretion to the plan administrator and because the fiduciaries had not expressly delegated their discretionary authority to the plan administrator, the district court employed the *de novo* standard of review).

Period."[10] The Policy defines "Disabled" to mean both "Total Disability and Totally Disabled and Partial Disability and Partially Disabled."[11] The term "Total Disability and Totally Disabled" is defined as follows:

> TOTAL DISABILITY and TOTALLY DISABLED mean because of Injury or Sickness:
>
> 1. the Person cannot perform the material and substantial duties of his regular occupation; and
>
> 2. after benefits have been paid for 24 months the Person cannot perform the material and substantial duties of any gainful occupation for which he is reasonably fitted by training, education or experience.[12]

"Injury" is defined by the Policy as "bodily injury resulting from an accident and independently of all other causes."[13] "Sickness" is defined as "illness, bodily disorder, disease, Mental Illness, or pregnancy."[14]

### B. Physical Requirements of Plaintiff's Regular Occupation as an Engineering Project Manager

Disability RMS interviewed Plaintiff about his claim. He described the duties of his occupation. He stated it includes designing building members, so memory and concentration are very important. He must communicate by phone with clients and assign tasks to the members of his team. He reported that sometimes he is onsite, climbing up a ten-story building. At other times he

---

[10]Admin. R. 677.

[11]Admin. R. 662.

[12]Admin. R. 170 and 666.

[13]Admin. R. 663.

[14]Admin. R. 665.

is in a field, walking a potential building lot. Or he may be out on a site inspection. He has driven to St. Louis to look at a building site, a four-hour drive each way.[15]

After Plaintiff appealed the first denial of his claim, Disability RMS interviewed his employer on February 15, 2008, about his job duties. Jim Steele, Vice President, stated that Plaintiff is the A/E manager. His job entails signing and directing design work to CAD designers. He has direct contact with the client and no physical labor, just sedentary desk work. He need lift no more than ten pounds. Sometimes he is on-site to meet clients and discuss a job. Mr. Steele estimated that Plaintiff is out of the office probably five per cent of his time. Climbing a ten-story building would mean simply riding in an elevator. Regarding the need to drive four hours to St. Louis, Mr. Steele stated it related to a specific job, not something consistent or frequent. Steele said that Plaintiff's job allowed for positional changes for comfort.[16]

During its review of the claim Disability RMS contacted a vocational rehabilitation consultant, Sue Howard, M.Ed. CRC. It requested an occupational analysis of the job of engineering project manager. She provided a report on February 20, 2008. It states the job most closely correlates to the occupation Project Engineer, Dictionary of Occupational Titles ("DOT") code 019.167-014. She noted that the DOT defines the occupation as requiring light physical exertion, with occasional lifting, carrying, pushing and pulling up to 20 pounds and typically, frequent, alternating sitting, standing, and walking. Ms. Howard found that the occupation of Project Engineer falls within the occupational group entitled Engineering Managers. In her report to Disability RMS, she concluded that the occupation Engineering Manager would likely involve a combination of

---

[15]Admin. R. 523-25.

[16]Admin. R. 28.

frequent positional changes from standing to sitting. She also found that, although the occupation is defined as a light occupation, it would be reasonable to expect that it involved office work that does not exceed sedentary physical exertion. Ms. Howard stated in her experience the occupation is defined as a light occupation because of the occasional need to travel on-site to clients' locations, and that otherwise sedentary exertion is typical.[17]

### C.      Plaintiff's Initial Claim for Long-Term Disability Benefits

Plaintiff filed his claim for long-term disability benefits on June 18, 2007, for disability commencing May 11, 2007. He submitted an Employee's Statement, an Employer's Statement, and an Attending Physician's Statement.[18] Plaintiff attached a sheet describing his injuries and medical condition and symptoms.[19] He reported being involved in a car accident in September 2006.[20] It resulted in pain to his neck and upper back.[21] Working on his computer and checking drawings made the pain worse. He also reported that on January 25, 2007, he fainted and hit his head. Since then he has experienced headache, lack of concentration, and forgetfulness. He reported that he feels tingles like needles in his arms and chest. He stated he has had lower back pain between L4 and L5 in his spine for several years, due to arthritic damage. He had heart valve replacement

---

[17]Admin. R. 217-19.

[18]Admin. R. 633-642.

[19]Admin. R. 638.

[20]The Court notes that the sheet Plaintiff attached to his claim states that the car accident occurred in September 2007. From a review of the entire administrative record, including the motor vehicle accident report (Admin. R. at p. 501), this appears to be a typographical error. The correct accident date appears to be September 19, 2006.

[21]Admin. R. 639.

surgery in 1989, which requires him to check his blood every two to four weeks. He also reported pain in his left knee when standing and walking, due to arthritic change.

In an Attending Physician's Statement, Dr. Kimberley McKeon, M.D., identified the following conditions as impacting the ability of Plaintiff to perform his occupational duties: headache, post-concussion syndrome, backache, and dizziness.[22] Dr. McKeon stated that Plaintiff could perform six hours of sedentary activity during an eight-hour workday, with no restrictions to upper extremity functions.[23] Dr. McKeon recommended an occupational therapy evaluation to assess work station modifications, which she believed would enable Plaintiff to return to work.[24]

### D. Medical Evidence in the Administrative Record

The medical evidence shows that Plaintiff had prosthetic aortic valve replacement surgery in 1998, which requires him to take blood thinner. On September 19, 2006, he was rear-ended in an automobile accident. The impact caused Plaintiff's driver's seat to break. The investigating officer documented that Plaintiff complained of back and neck pain, but declined medical attention.[25] After the accident he sought medical treatment and had an X-ray and MRI of his lower and upper back.

On November 28, 2006, Plaintiff saw Robert C. Sharpe, M.D., orthopedist, for an evaluation of his left knee. He told Dr. Sharpe he had suffered from knee pain since the motor vehicle accident.

---

[22]Admin. R. 636-37.

[23]*Id.*

[24]*Id.*

[25]Admin. R. 501-503.

Dr. Sharpe diagnosed Plaintiff with patellofemoral chondromalacia of the left knee. After discussion of his treatment options, Plaintiff wished to proceed with a cortisone injection.[26]

On January 4, 2007, Plaintiff saw chiropractor Joseph Conigilaro, D.C., with Kansas City Health and Wellness. His primary complaints were to his upper and lower back, neck, and knee pain. He attributed his pain to the motor vehicle accident of September 2006. While talking to the chiropractor after treatment, Plaintiff momentarily lost consciousness and fell forward from the treatment table. The chiropractor was able to break the fall. Plaintiff nevertheless fell to the floor, hitting his face with enough force to cause abrasions to his right cheek and forehead. Plaintiff regained consciousness within ten seconds. He told the chiropractor he had had very little to eat that day. He refused the offer of an ambulance to a local emergency room. After waiting twenty minutes and eating a light snack, Plaintiff returned to work, which was in the same building as the chiropractor's office.[27]

Between January 5 and February 12, 2007, Plaintiff returned to Dr. Conigilaro for fifteen chiropractic treatments, usually consisting of massage, to alleviate his back pain.[28]

On February 2, 2007, Plaintiff had a CT head scan. It showed no evidence of an intracranial mass, hemorrhage, or extracerebral fluid collection. The report noted mild cortical atrophy. It concluded "no acute abnormality noted."[29]

---

[26]Admin. R. 386.

[27]Admin. R. 498, 583.

[28]Admin. R. 577-83.

[29]Admin. R. 550.

On February 26, 2007, Plaintiff had an MRI of the cervical spine at Heartland Spine and Speciality Hospital. Radiographic findings showed disk desiccation at L4-5 and L5-S1 levels. Mild disk bulging existed at the L4-5 level.[30]

On March 5, 2007, Plaintiff saw Dr. Charles Weinstein, M.D., for a neurological consultation. Dr. Weinstein reported that Plaintiff described a constant, generalized headache which was equally bilateral. His headaches started with the chiropractic treatment in January and his falling and striking his head on the floor. He described the headaches as varying in intensity throughout the day. He denied any associated symptoms, even when the headache was severe. He complained of cognitive slowing. He stated that stress increases his headache intensity. He reported no radicular pain in the arms, visual disturbances, nausea, or photophobia. He reported no substantial reduction in headache intensity with medication. Dr. Weinstein concluded that Plaintiff provided a history consistent with postconcussion headache; as his reported symptoms of cognitive slowing, sleep disturbance, dizziness and paresthesias (tingling sensation) are commonly associated symptoms. Dr. Weinstein stated that he discussed postconcussion headache with Plaintiff. The doctor emphasized that recovery is often quite slow and may take several months to be complete. He started Plaintiff on a trial of nortriptyline for the headaches.[31]

On March 7, 2007, Plaintiff saw an orthopedist, Dr. Jeffrey MacMillan, M.D., for an evaluation of his back. Plaintiff reported history of progressively worsening lower back pain for a period of two to three years. He reported the pain is provoked by extended periods of sitting and any attempted lifting or carrying. He also complained of pain between his shoulder blades with

---

[30]Admin. R. 375.

[31]Admin. R. 391-92.

symptoms beginning after a motor vehicle accident. Since then, whenever he stands, he experiences a sharp stabbing pain between his should blades. The pain becomes increasingly severe throughout the day and is provoked by attempts to use his hands above shoulder level. Both the chiropractic and medication failed to alleviate his discomfort. Dr. MacMillan noted during his examination that Plaintiff exhibited age-appropriate motion without obvious discomfort. The doctor remarked that X-rays of the lumbar spine in September 2006 demonstrate normal soft tissue shadows and mild disk space narrowing at L4-5. The spinal architecture appeared otherwise normal. Lumbar MRIs from December 8, 2006, and February 26, 2007, demonstrated disk desiccation, disk space narrowing and extensive modic changes at L 4-5. An MRI of the thoracic spine appeared normal. Dr. MacMillan reported he did not have a good explanation for the upper back pain, but that the low back pain appeared to be the result of a degenerative L4-5 disk. He suggested that Plaintiff try a TENS unit. Beyond that, an interbody fusion or disk arthroplasty appeared to be appropriate choices of treatment for the low back pain.[32]

On April 9, 2007, Plaintiff saw Dr. Charles Weinstein, M.D., for a neurological follow-up. Dr. Weinstein reported that, in addition to headaches, Plaintiff continues to complain of poor sleep maintenance and problems with cognitive slowing and concentration. The doctor indicated these are all common symptoms associated with postconcussion headache. Plaintiff reported that nortriptyline had not altered his headache significantly. Dr. Weinstein increased the doseage.[33]

On April 17, 2007, Plaintiff saw a family practice physician, Dr. Kimberly McKeon, M.D., about his concerns. He complained of pain to his left knee and upper and lower back. He reported headaches since his fall at the chiropractor's office. He complained of decreased energy level,

[32]Admin. R. 614-15.

[33]Admin. R. 389.

fatigue, malaise, insomnia, back and neck pain, stiffness in joints, dizziness, numbness, tingling sensations, memory problems, and vision difficulties. Physical examination indicated bilateral upper and lower paraspinal muscle tenderness, but with full range of motion and normal strength and tone.[34]

On April 27, 2007, Plaintiff again saw Dr. Weinstein for neurological follow-up. Plaintiff reported diffuse tingling sensations across his chest and in both arms distal to the elbow. He had experienced those sensations for about two weeks. Plaintiff also reported no change in his headaches or in his cognitive slowing, following the higher dose of medication. He continued to complain of chronic headache and neck discomfort.[35]

Plaintiff entered Providence Medical Center for emergency on April 28, 2007. He complained of left arm and chest numbness and tingling and chest pain. A cranial CT scan was negative. Plaintiff was treated, released, and told there was no evidence of any cardiac ischemia.[36]

On May 1, 2007, Plaintiff saw his primary care physician, Dr. McKeon, as follow-up from his emergency room visit. He reported episodes of dizziness, lasting longer than he previously experienced. He complained of decreased energy level, fever, chills, fatigue, malaise, abdominal pain, nausea, back and neck pain, joint stiffness and swelling, weakness, episodes of dizziness, headaches, numbness, tingling sensations, insomnia, and memory problems. Physical examination indicated bilateral upper and lower paraspinal muscle tenderness, but with full range of motion, normal strength and tone. Dr. McKeon assessed the condition was chest pain, chronic low back

---

[34]Admin. R. 599-604.

[35]Admin R. 388.

[36]Admin. R. 562.

pain, headache, and postconcussion syndrome. Her treatment notes suggest that most of the symptoms are consistent with postconcussion syndrome after the head trauma earlier in the year.[37]

Plaintiff had an MRI of the brain at Lawrence Memorial Hospital on May 8, 2007. The findings note "mild, bilaterally symmetrical enlargement of the cortical salci over the convexities, consistent with atrophy. This is somewhat greater than expected for his age. There is nonenhancing, 2-mm punctuate focus of fluid intensity signal within the left cerebral peduncle. This is a nonspecific finding and may be related to remote trauma or ischemia."[38]

On May 11, 2007, Plaintiff entered St. Luke's Hospital with an admitting diagnosis of acute onset of light-headedness and dizziness. It began while he was at work. His co-workers summoned paramedics. At the hospital Plaintiff saw Dr. Karen Arkin, M.D., neurologist, and Dr. Anthony Magalski, M.D., cardiologist. The discharge report states that he had orthostatics and no evidence of orthostatic hypotension. He was monitored with telemetry with no evidence of arrhythmia. He complained of back pain in the thoraric region. A thoracic spine film demonstrated mild compression in the T4 region. Plaintiff was discharged the next day with instructions to follow up with his primary care physician.[39]

In her May 11, 2007 report, neurologist Dr. Arkin states that Plaintiff reported having increased difficulty with concentrating at his job, which is very demanding with many deadlines. He reported difficulty in completing jobs and makes occasional errors. Her impression is:

> This is a rather perplexing case of a gentleman with numerous somatic complaints, he appears to be somewhat anxious and mildly depressed. I do suspect that he likely has post concussive syndrome and chronic cephalgia as the result of the fall and head

---

[37]Admin. R. 596-98.

[38]Admin. R. 594.

[39]Admin. R. 530-31.

injury that he experienced in January. He also appears to have some chronic shoulder girdle myofascial pain as a result of his whiplash injury. I have reassured him that there is no evidence that there is anything serious going on such as multiple sclerosis, brain tumor, stroke, etc. and his recent MRI of the brain which is reportedly normal confirms this. I have recommended to him that he try nortriptyline 25 mg at night, to titrate to 50 mg at night after 5 days, as well as some Skelaxix 800 mg for breakthrough pain, if he tolerates.

In regards to his persistent lightheadedness and I think that this is a persistent lightheadedness and of 1 hour's duration yesterday and migratory paresethesias, which have now resolved, I think that this is probably more likely related to anxiety and sleep deprivation, as are his cognitive complaints. He was not orthostatic when I tested him today."[40]

Plaintiff again saw his primary care physician, Dr. McKeon, for follow-up after his hospitalization and for evaluation of headaches. He reported longer episodes of dizziness. He complained of decreased energy level, fatigue, malaise, easily tiring, vision difficulties, back and neck pain, joint stiffness and swelling, weakness, headaches, numbness, tingling sensations, insomnia, and memory problems. Upon physical examination Dr. McKeon noted bilateral upper and lower paraspinal muscle tenderness, but with full range of motion, normal strength and tone, no midline tenderness, and no muscle spasm. She noted that the MRI of May 8, regarding headache, shows "atrophy greater than expected for age but no other abnormalities to explain his symptoms. Again discussed the postconcussion syndrome with patient and feel this is probably what is going on." She prescribed amitryptyline and ultram for pain.[41]

Plaintiff saw Dr. McKeon again on May 29, 2007. He reported he had been going to physical therapy for upper and lower back pain, which was helping. But he expressed concerns about the ongoing pain. He had used a TENS unit at therapy, but it did not help. He felt some relief with heat patches, but had trouble placing them. He complained of back and neck pain, joint

---

[40]Admin. R. 538.

[41]Admin. R. 590-92.

stiffness and swelling, weakness, episodes of dizziness, headaches, numbness, tingling sensations, insomnia, and memory problems. Dr. McKeon reviewed the MRI report with Plaintiff. She noted no abnormality on cervical MRI. She concluded the backache was likely musculoskeletal. She recommended that Plaintiff continue with physical therapy, heat, massage, and occupational therapy for the present. She noted DJD and mild disc changes at L4-L5. She recommended Plaintiff be evaluated at the pain clinic.[42]

On June 7, 2007, Plaintiff saw neurologist, Dr. Taijun Zhao, M.D., for consultation for his headaches, decreased memory and concentration level, and bilateral hand and finger tingling and numbness. His impression was that Plaintiff had post-head injury, headaches, decreased concentration level, short-term memory problems, and other mild cognitive dysfunctions. He found it likely that Plaintiff has post-concussion syndrome. There were no significant focal neurological deficits. MRI of the brain was nonspecific. Bilateral forearm and finger tingling and numbness became worse at night. Dr. Zhao noted that Plaintiff was taking amitriptyline and nortripyline, seemingly without relief from his symptoms. Dr. Zhao discontinued these medications. He prescribed Topamax and Midrin for relief from headaches.[43]

On June 13, 2007, during one of his chiropractic sessions with Dr. Schuck, Plaintiff claimed to experience pain of 10 on a scale of 1 to 10. He also reported that he experiences this pain 75 to 100% of the day. He complained of pain to his upper and low back, right knee, and neck. Dr. Schuck found misalignment in the cervical, thoracic, lumber, and sacral regions.[44] Plaintiff returned

---

[42]Admin. R. 588-89.

[43]Admin. R. 336-38.

[44]Admin. R. 358.

to him for sixteen chiropractic visits to alleviate pain between June 14 and September 10th.[45]

Plaintiff submitted his claim for long-term disability benefits to Defendant on June 18, 2007. On June 27, 2007, Disability RMS contacted Plaintiff for a telephone interview regarding his claim. When asked what changed at the time he stopped working, he referred to the motor vehicle accident of September 2006 and to constant low-back pain since then. He said that before the accident he had it only occasionally. He said his knee then started to hurt and then his upper back. He stated that he kept reducing his time at work to six hours, and then five, using his paid time off to make up the difference. He said he did less and less, until every part of his body hurt and he could no longer work. He said he was not seeing a specialist for pain management and had not been referred to a psychiatrist or therapist. He reported current symptoms to include a lack of concentration. He described his back pain as beginning in the morning as soon as he gets out of bed and increasing throughout the day. He reported experiencing upper back pain while standing and lower back pain when sitting. He said sometimes he can sit for only five minutes until the pain becomes unbearable and becomes worse with continued sitting. He reported that his knee hurts when he stands and if he rolls over on it wrong in bed. It does not hurt when he sits. He described his pain as "really painful." He sometimes has a sharp pain when he stands, and he drops back into the chair. He has pain in his arms from the elbow down to the hands with tingling. He said he also experiences prickly needle-like tingling in his chest. He lives alone. He has no one to assist him with travel and daily care.[46]

Plaintiff participated in a neuropsychological evaluation on June 27 and August 3, 2007, administered and evaluated by Dr. Terrie Price, Ph.D. Dr. Price noted in the Clinical Impressions

---

[45]Admin. R. 342-57.

[46]Admin. R. 523-26.

section of her report that during interview Plaintiff evidenced pain behavior, such as wincing, repositioning, standing, and some stretching. She found him to be an adequate historian overall, without problems in communication. Testing revealed him to be slow to respond but not defensive, anxious, or depressed. He gave good effort. At one point Plaintiff complained of a bad headache and appeared to be in pain. He took several breaks to stand and stretch, reporting that his back was hurting. Dr. Price noted that Plaintiff appeared to have severe back pain at times. Her testing indicated his motor functions were severely delayed or well below average. On measures of attention, his scores ranged very low--lower than would be expected. Memory testing led to findings of below average and subaverage. Testing for emotional functioning indicated "very low defensiveness to suggest the possibility of symptom magnification or presentation of self as having significant pain."[47]

Dr. Price reported that the presentation of Plaintiff appears to be significantly affected by significant pain. The injury event presents as a concussion. She noted that, while the majority of individuals with concussion recover within the first three months, the reported concussion to Plaintiff is seven to eight months earlier. She noted deficits across all the domains and in excess of what would be expected from atrophy or a concussion event. Her clinical impressions revealed that Plaintiff presented a significant amount of pain, which may have interfered with the testing. Dr. Price alternatively noted that the profile may reflect that Plaintiff sees himself as substantially limited, which may reflect how he sees himself. She noted that a short course of cognitive therapy may help to provide strategies to enhance short-term memory, attention, and speed. She found it less likely that significant long-term residual changes in cognitive functions would develop.

---

[47]Admin. R. 443.

For vocational implications Dr. Price stated that the profile likely reflects how Plaintiff sees himself. He appears to function at a higher level than testing suggests. Her impression was that his behavior during testing suggests limitations from pain. She noted that he verbally expressed and frequently evidenced pain behavior, such as moving around to reposition and stretch. Her diagnosis was pain disorder associated with psychological factors and general medical condition, anxiety disorder not otherwise specified.[48]

Disability RMS asked Dr. Richard Levy, M.D., as an independent medical consultant, to review the medical records of Plaintiff and communicate with his physician. Dr. Levy reviewed the accident report, chiropractic notes, orthopedic notes from Dr. MacMillan, hospital records from St. Luke's Hospital, and primary care notes of Dr. McKeon. He did not personally examine or interview Plaintiff. Nor was he able to speak to the primary care physician, Dr. McKeon. In his Medical Report of August 7, 2007, Dr. Levy concluded that "claimant is fit to work in spite of his subjective complaints. Depression and anxiety are not reasons to be disabled in this clinical setting. In my opinion, he is fit to work without restrictions."[49]

By letter dated August 21, 2007, Disability RMS denied the claim for long-term disability. It concluded that the information in the claim file did not support impairment or the inability of Plaintiff to perform his occupation as an Engineering Project Manager. It stated, in pertinent part:

> [Plaintiff] is claiming disability as of 5/11/07 due to headache, backache, post-concussion syndrome, and dizziness.

> As part of our review of [Plaintiff's] claim, we requested and received medical records from your treating providers including Dr. McKeon, Dr. Zhao, Dr. MacMillan, Dr. Congliaro, Dr. Arkin, and Dr. Magalski.

---

[48]Admin. R. 443.

[49]Admin. R. 487-89.

We referred all of the medical records in [Plaintiff's] claim file to a Disability RMS Medical Consultant on 07/16/2007. He noted that multiple somatic complaints are found in the medical documentation. He noted that there is no evidence that [Plaintiff] should have memory loss or that he does in the office visits or in the initial telephonic interview with our office for his disability claim. In addition, his neurologist, Dr. Arkin identified that the cognitive complaints are likely due to anxiety and poor sleep. Our medical consultant also noted that there is no evidence on Magnetic Resonance Imaging (MRI) testing or in the medical documents to objectify the complaints of back pain and there is no evidence in the file to suggest that he needs to be out for his back pain complaints. He concluded that the only conditions which may be impairing but have not been investigated are [his] anxiety and possible his psychiatric/psychological status.

We requested and received a copy of [Plaintiff's] motor vehicle accident record and further documents from Dr. Congliaro regarding your client's reported loss of consciousness during an office visit on 01/31/2007. We referred all of the medical information in your claim file to an independent Physician Consultant, Dr. Richard Levy, MD, board certified in Neurology, for his review.

Dr. Levy's review noted that following [Plaintiff's] motor vehicle accident on 09/16/06, the investigating officer documented no loss of consciousness, no symptoms of a concussion, and that [Plaintiff] complained of back and neck pain. [Plaintiff] declined medical attention following the accident. Three months following the motor vehicle accident in an office visit note dated 01/11/07, [Plaintiff] had minimal lower extremity back pain. He also noted that following your client's possible vasovagal syncopal event at the chiropractor's office on 01/31/07, there was no loss of consciousness and he did not behave as what one might expect when concussed, such as he was no amnestic of the episode and was not disoriented or repeating himself. In addition, [Plaintiff's] chiropractor, Dr. Congliaro, attributed the synocope to a combination of low blood sugar and orthostatic hypotension.

Following the 01/31/07 chiropractor's office visit, [Plaintiff] was seen by an orthopedist, Dr. MacMillan. A lumbosacral MRI revealed degenerative joint disease. [Plaintiff] then went on to treat with Dr. McKeon. In April 2007 he was diagnosed with headaches after a fall. In April 2007 he went to an Emergency Room complaining of tingling and had a negative Computerized Axial Tomography (CT scan) of the head. In May 2007 he was diagnosed as having a postconcussive syndrome. In May 2007 he was admitted to the hospital because of dizziness and headache. Dr. Arkin performed a thorough neurologic consult and concluded that she suspected that [Plaintiff] had numerous somatic complaints related to anxiety and depression but also opined that he might have had a concussion and postconcussive syndrome.

*     *     *

Dr. Levy concluded that in order to have postconcussive syndrome a person must be concussed. He stated that there need not be loss of consciousness but the patient

should be amnestic of the event and typically they are disoriented and repeated themselves and they are dizzy. He states that [t]here was no evidence this was the case which leads him to seriously question the diagnosis of a postconcussive syndrome. He further concluded that he opines that the claimant is fit to work in spite of his subjective complaints.[50]

From August 23, 2007 to September 4, 2007, Plaintiff traveled to Iran. There he obtained an MRI of his left knee, thoracic spine, and lumbosacral spine. The translated report of the MRI of the left knee revealed "intrasubstance degenerative process involving the posterior horn of medial meniscus but the lateral meniscus is intact." The translated report of the MRI of the thoracic spine revealed "marked dehydration of disc at multiple thoracic levels but there is no evidence of disc herniation." The report of the MRI of the lumbosacral spine revealed "marked dehydration of L4-L5 disc level with central disc protrusion but there is no sign of nerve root compression."[51] The orthopedist he saw in Iran at the Fars University of Medical Sciences and Health Services advised him to avoid doing heavy physical activities and sitting for a long time, due to the discopathy of intervertebal disk L4-L5. He recommended medication and physiotherapy.[52]

On September 13, 2007, Plaintiff returned to Dr. McKeon. He complained of lower and upper backache. Plaintiff reported that, while visiting his mother in Iran, he had worsening back pain and saw doctors there and had an MRI. Dr. McKeon suspected the backache was muscular and that underlying depression is also contributing to his symptoms. She noted that Plaintiff has been

---

[50]Admin. R. 469-70.

[51]Admin. R. 378-81.

[52]Admin. R. 377.

unwilling to try anti-depressants. She told him to continue with physical therapy and a follow-up at a pain clinic.[53]

Plaintiff saw a physical therapist, Lydia Neu, RPT, for his neck and upper back pain. She completed a Medical Source Statement, dated September 13, 2007. It indicates what Plaintiff could do on a regular and continuous basis, despite his impairments. She indicated that he could lift and carry frequently five pounds. He could stand or walk continuously for fifteen minutes and stand or walk for two hours throughout an eight-hour day. He could sit continuously for 30 minutes at a time, and sit for two hours throughout an eight-hour work day. The therapist indicated that Plaintiff would need to lie down or recline to alleviate pain symptoms for ten to fifteen minutes every 30 to 60 minutes during an eight-hour work day.[54]

On September 17, 2007, Plaintiff again saw Dr. Schuck. The chiropractor completed a Medical Source Statement. It also indicated what Plaintiff could do on a regular and continuous basis, despite his impairments. Dr. Schuck stated that Plaintiff could frequently lift and carry ten pounds and occasionally 25 pounds. Plaintiff could stand or walk continuously for 45 minutes and stand or walk for two hours throughout an eight-hour day. Plaintiff could sit continuously for one hour and sit for three hours through an eight-hour work day. The report noted that pushing and pulling were limited in that the activity could aggravate his upper back condition.[55]

_____

[53]Admin. R. 366-69.

[54]Admin. R. 411-12.

[55]Admin. R. 363-64.

Plaintiff continued to seek chiropractic treatments from Dr. Schuck several times a week. He had approximately twenty-seven such treatments between September 18, 2007, and February 27, 2008.[56]

Plaintiff saw a neurology specialist, Dr. Sanjeev Kumar, M.D., on October 16, 2007, for consultation upon referral by his primary care physician. Dr. Kumar reported that Plaintiff complained of headaches. Plaintiff described his headache as bilateral temporal and occipital, dull in character, five to six out of ten in severity, daily and lasting for hours. He reported no visual phenomena, blurring or loss of vision, difficulty with speech or swallowing, asymmetic motor or sensory loss, vertigo, or balance or gait difficulty. He complained of occasional dizziness, described as lightheadedness, which does not impair him. He also complained of dull neck ache most of the time and worse with movement. He reported suffering from sharp low-back pain. Dr. Kumar reported his impression as chronic daily headaches, likely tension/contraction headaches, history of postconcussion syndrome, chronic neck and low back pain, and memory loss that could be related to his mood. Dr. Kumar prescribed Zanaflex.[57]

On November 1, 2007, Plaintiff underwent an EEG by Lawrence Neurology Specialists. It was unremarkable.[58]

---

[56]Admin. R. 82-110.

[57]Admin. R. 451.

[58]Admin. R. 157.

Plaintiff continued with physical therapy from October 22 through November 8, 2007. At his appointment on November 1, 2007, he reported inability to perform any activity with his arms out in front of him for very long, such as moving his arms to use a computer or carry anything.[59]

Plaintiff saw his primary care physician, Dr. McKeon, for follow-up for test results on November 5, 2007. He reported that he saw little difference from the physical therapy and that his only comfortable position is lying down. Plaintiff reported a lot of problems with memory. He felt this and pain problems had continued to prevent his working. Dr. McKeon told Plaintiff that the tests for his back and neck did not correlate with the degree of pain and disability he reported. Her impression was that most of the pain was musculosketetal, likely related to stress, anxiety, or depression, which need to be controlled, in order to alleviate his pain. Plaintiff stated his continued belief that something was wrong in his back, but he was willing to try medication for mood to see if it would help his other symptoms and to try a behavioral pain management program as recommended by his psychologist. Aside from the anti-depressants and pain management program, Dr. McKeon stated that from her perspective she had done everything she could do for him.[60]

Plaintiff appealed the denial of benefits on December 14, 2007, submitting medical records from Dr. Kumar, Dr. Price, physical therapist Neu, Pain Management Clinic, Dr. Weinstein, Dr. Sharpe, Fars University of Medical Sciences and Health Services, Heartland Spine and Speciality Hospital, Dr. McKeon, Dr. Schuck, Dr. Zhao, and Dr. Tsue.[61] Plaintiff asserted in his appeal that the newly submitted medical records show an inability to perform the material and substantial duties of his regular occupation. He suggested he is not able to complete a full eight-hour work day, due

---

[59]Admin. R. 150-153.

[60]Admin. R. 145-47.

[61]Admin. R. 308-12.

to pain, resulting from lumbar degenerative joint disease, a disc bulge at L4-L5, a mild compression fracture of T3, and myofascial pain syndrome. He also suffers from headaches, diminished concentration, poor sleep maintenance, and problems with cognitive slowing as a result of post-concussion syndrome, as diagnosed by at least two separate examining neurologists.[62]

Plaintiff saw neurologist Dr. Kumar for follow-up on December 18, 2007. Dr. Kumar stated that the EEG of November 1, 2007 was unremarkable and his laboratory workup largely negative. Plaintiff reported he had headaches. The medication prescribed, Zanaflex, had not helped. It had caused chest pain and decreased his heart rate. Plaintiff indicated his memory issues were the same, i.e., difficulty remembering the phone number where he has worked for seven years. His chronic neck and back pain remained the same. Dr. Kumar reported his impression was postconcussion syndrome, chronic pain, possible mood disorder, and poor memory. Dr. Kumar discontinued Zanaflex. He prescribed Lyrica to help with headaches and various pain conditions.[63]

On December 19, 2007, on the referral by his primary care physician Dr. McKeon, Plaintiff sought a behavioral pain management evaluation at the Lemons Center for Behavioral Health & Wellness. He met with Stacey A. Carter, Ph.D., a licensed psychologist. Dr. Carter reported that Plaintiff presented multiple complaints of pain. His primary complaint was about his upper back, with secondary pain complaints in his neck and headaches. His third and fourth pain complaints were to his lower back and left knee. Dr. Carter observed that Plaintiff displayed at least moderate pain behavior during the interview, such as frequently adjusting his seat and standing and walking. She diagnosed him with pain disorder associated with both psychological factors and a general

---

[62]Admin. R. 308-12.

[63]Admin. R. 155-57.

medical condition. She indicated that, from a psychological standpoint, Plaintiff appears to be an appropriate candidate for a comprehensive pain program.[64]

Disability RMS contacted Andrea J. Wagner, M.D., board certified in physical medicine and rehabilitation, to perform an independent medical review of the health care records of Plainitiff. In her report of February 11, 2008, Dr. Wagner found that, based on her review of the available medical evidence, Plaintiff could function at least at the light level with restrictions and limitations to change posture when needed. She found very little objective evidence of impairment, with the principal issue being the subjective pain complaints. She found the self-reported complaints far in excess of the physical findings and greater than what would be expected, given the lack of findings upon examination and very mild findings upon MRI imaging. She noted that the imaging studies revealed minimal findings that do not correlate with any findings upon physical examination. She also noted that Plaintiff has been able to travel abroad and could function while living alone. She stated that degenerative changes on MRI imaging are commonly found and correlate poorly with his symptoms. Given his reportedly prolonged high subjective pain levels, she found it likely that there is a non-organic component to his complaints of pain. She states that the frequency of treatment appears to be largely determined by Plaintiff's pursuit of an organic explanation for his subjective pain complaints.[65]

Disability RMS also requested Jacquelyn Olander, Ph. D., a consulting neuropsychologist, to perform an independent review of Plaintiff's neuropsychological records. In her report of February 11, 2008, Dr. Olander noted that a review of Plaintiff's medical records consistently revealed unremarkable neurological examinations and neuroimaging. She found his performance

[64]Admin. R. 76-80.

[65]Admin. R. 259-70.

on a neuropsychological evaluation raised significant concern about the possibility of malingering, because his scores were inconsistent with brain functioning, his independent life and inconsistencies. Dr. Olander opined that the records do not suggest that Plaintiff cannot work or that he suffers from cognitive limitations or needs restrictions. In her opinion he had not experienced significant cognitive changes to prevent him from working full-time at his previous or similar occupation. She found the diagnosis of post-concussion syndrome questionable, because Plaintiff's loss of consciousness on the chiropractor's table preceded his fall.[66]

Disability RMS denied Plaintiff's long-term disability on February 20, 2008.[67] It upheld its original denial that Plaintiff was capable of performing the material and substantial duties of his regular occupation as an engineering project manager. It based its determination on the opinions of its physician consultants Dr. Levy and Dr. Wagner, neuropsychologist consultant Dr. Olander, and vocational consultant Sue Howard. Disability RMS found that the medical evidence showed little objective evidence of impairment to support his reported symptoms. It noted unremarkable and mild degenerative changes on his MRI studies. It found the diagnosis of post-concussive syndrome questionable and found that the complaints of pain by Plaintiff exceeded by far any physical findings. It also found his performance on Dr. Price's neuropsychological evaluation highly suspect and suggestive of malingering, given his exaggeration of complaints and poor effort. Relying upon the opinion of the vocational consultant, it found that Plaintiff was capable of functioning at least

---

[66]Admin. R. 251-58.

[67]Admin. R. 211-14.

at the light level with restrictions and that his occupation is considered "sedentary-to-light" with respect to physical demands and would allow relief for alternate body positions as needed.[68]

On April 15, 2008, Plaintiff requested an appeal of the February 20, 2008 determination. He and submitted additional medical records from the Lemons Center for Behavioral Health and Wellness, Dr. Schuck, Cardiovascular Consultants, Dr. McKeon, Neu Physical Therapy, and Dr. Kumar.[69]

Plaintiff's attorney contacted Michael K. Lala, MA, a certified rehabilitation counselor to review the Behavioral Pain Management Evaluation of December 19, 2007, completed by psychologist Stacey A. Carter, Ph.D. and the letter of April 11, 2008, from Patty Redmond, case manager for the Lemons Center for Behavioral Pain Management. Mr. Lala stated in his letter of April 17, 2008 letter to the attorney that "it would be my professional opinion that if a person with the same work background as [Plaintiff] were required to be away from work approximately four and a half hours of the working day, five days a week, that person would not be able to maintain employment as an engineering project manager."[70]

Disability RMS retained medical consultant Alan Neuren, M.D. to conduct a medical review of the entire claim file. In his report of June 13, 2008, Dr. Neuren noted that Plaintiff had seen four neurologists, three cardiologists, two orthopedists, two psychologists, and at least one primary care specialist. Dr. Neuren thought that the complaints of Plaintiff were out of proportion to findings upon clinical examination and diagnostic testing. He noted that the imaging studies were either normal or showed minimal degenerative changes, commonly seen in asymptomatic adults in the age

---

[68]*Id.*

[69]Admin. R. 69-70.

[70]Admin. R. 53.

group of Plaintiff. Dr. Neuren concluded: "There is no support for functional impairment from a physical condition. [Plaintiff] does not have a physical condition that would preclude him from functioning in his usual capacity. Records would indicate there could be the presence of mental/nervous problems contributing to his complaints, although inconsistencies in the neuropsychological testing would raise concern about symptom embellishment. Regardless, this should not result in impairment. Moreover, he has not received mental health intervention as recommended."[71]

On June 24, 2008, Disability RMS denied the request for another appeal. It concluded that there was no condition, alone or collectively, resulting in total disability when Plaintiff ceased work on May 10, 2007, continuously through the ninety-day elimination period and continuously thereafter.[72]

## V.      The De Novo Standard of Review

"When applying a de novo standard in the ERISA context, the role of the court reviewing the denial of benefits is to determine whether the administrator made a correct decision."[73] The standard "is not whether 'substantial evidence' or 'some evidence' supported the administrator's decision; it is whether the plaintiff's claim for benefits is supported by a preponderance of the evidence based on the court's independent review."[74] While the administrator's decision is accorded

---

[71]Admin. R. 36-42.

[72]Admin. R. 22-23.

[73]*Niles v. American Airlines, Inc.*, 269 Fed. Appx. 827, 832 (10th Cir. 2008) (citing *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 808-09 (6th Cir. 2002)).

[74]*Id.* at 833.

no deference or presumption of correctness, the administrator's decision is still the decision under review.[75]

De novo review generally consists of the court's independent weighing of the facts and opinions in the administrative record to determine whether the claimant has met his burden of showing that he is disabled within the meaning of the policy.[76]  In interpreting any plan provision, the court gives the plan language its common and ordinary meaning, which a reasonable person in the position of the plan participant would have understood the words to mean.[77]  The court gives no deference to either party's interpretation of the plan.[78]  Even when the court reviews the case *de novo*, the burden of proof remains with the plaintiff to prove by a preponderance of the evidence that he or she is disabled within the meaning of the plan.[79]  Under the definition of Disabled under the Plan in this case, Plaintiff has the burden to prove that because of injury or sickness he "cannot perform the material and substantial duties of his regular occupation."[80]

## VI.    Review of Administrative Record

Reviewing the administrative record under a *de novo* standard of review, the Court finds that Plaintiff has not satisfied his burden to show that because of injury or sickness he cannot perform the material and substantial duties of his regular occupation as an engineering project manager.  The

---

[75]*Id.* at 832.

[76]*Cowser v. Am. United Life Ins. Co.*, No. 02-4089-JAR, 2005 WL 1799236, at *4 (D. Kan. July 6, 2005).

[77]*Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1511 (10th Cir. 1996).

[78]*Firestone Tire & Rubber Co.*, 489 U.S. at 112-13.

[79]*Thompson v. Union Sec. Ins. Co.*, 688 F. Supp. 2d 1257, 1264 (D. Kan. 2010). *See also McGee v Equicor-Equitable HCA Corp.*, 953 F.2d 1192, 1205 (10th Cir. 1992) ("It is a basic rule of insurance law that the insured carries the burden of showing a covered loss has occurred . . . . ").

[80]Admin. R. 170.

medical evidence in the record shows many subjective complaints. Various health care providers of Plaintiff have confirmed the legitimacy of some of his complaints by objective findings. X-rays, for example, have shown some narrowing of the L4-5 disk space in the low back. Plaintiff has pursued various recommendations, principally medication, chiropractic, and physical therapy. Much of the medical record, however, including reports of treating health-care providers, find that the complaints exceed what the objective findings justify. Several of the treating doctors suggest the presence of psychological problem**s,** exaggeration of complaints, and an unwillingness by Plaintiff to consider psychiatric help.

Two basic considerations lead the Court to its conclusions and ruling. First is the lack either of expert medical opinion or other evidence, besides the subjective complaints of Plaintiff, that adequately connects his physical and psychological problems to an injury or sickness, as defined by the insurance plan. Of his various health-care providers only physical therapist Neu and chiropractor Dr. Schuck suggest that Plaintiff cannot perform the duties of his job for an eight-hour work day. And their evaluations provide no indication that such disability is the product of an injury or sickness that prevents him from working at his job. Plaintiff himself attributes his symptoms to a vehicle accident in September 2006 and to a fall from a chiropractic treatment table in early 2007. But, without some medical opinion to make the connection, the descriptions of these two instances in and of themselves hardly justify a finding of disability that prevents Plaintiff from working at his job. And the Court finds no evidence, even from his treating doctors, to suggest that he has such a disability because of these accidents. They simply reflect that he himself says that. Much of the medical record does refer to continuing complaints that lack confirmation by objective findings and that indeed may be the result of psychological factors, rather than an injury or sickness.

A second consideration that leads to the Court's ruling relates to evidence that affirms that Plaintiff does not have a disability that prevents him from working at his employment. The record includes the expert opinions of three physicians and a neuropsychologist, all of whom reviewed the medical records submitted by Plaintiff: Richard Levy, M.D.; Andrea Wagner, M.D.; Jacquelyn Olander, Ph.D; and Alan Neuren, M.D. Dr. Levy, board certified in neurology, conducted his review and prepared his report in August 2007. He thus reviewed the record of the early treatment to Plaintiff. Doctors Wagner and Olander conducted their reviews in February 2008. Dr. Wagner is board certified in physical medicine and rehabilitation. Dr. Neuren, board certified in psychiatry and neurology, reviewed the entire claim file, including the medical records, in June 2008. The opinions of these four reviewers are consistent with regard to the lack of evidence to justify a finding of disability. They conclude that the records do not support a finding that Plaintiff is unable to work. The records show a lack of correlation between the subjective complaints and the limited objective findings that are reported. They suggest that Plaintiff is able to work at his employment without restrictions. These reviewers did not themselves see or conduct a physical examination of Plaintiff. From the record, however, they appear to be the only experts who reviewed the entire medical record in this case. They base their opinions upon thorough, comprehensive overviews of the Plaintiff and not the more limited reviews provided by the treating health care providers.

In summary, the Court finds that the preponderance of evidence weighs against the Plaintiff, because of a lack of evidence that connects his complaints and problems to an injury or sickness that prevents him from performing the material and substantial duties of his occupation as an Engineering Project Manager. To the contrary, the Court finds that the weight of the evidence shows that Plaintiff can perform the duties of his occupation.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (doc. 17) is granted.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Judgment on the Administrative Record (doc. 19) denied.

Dated in Kansas City, Kansas on this 30th day of September 2010.

<u>S/ Gerald L. Rushfelt</u>
Gerald L. Rushfelt
United States Magistrate Judge